IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Action No. **3:17-CR-49-L** |
| | § | |
| **MORRIS BURRELL HAYNES** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are Defendant's Motion to Suppress (Doc. 33), filed April 25, 2017; and

Defendant's Motion for Severance (Doc. 52), filed June 13, 2017.[1]  After considering the motions,

briefs, law, evidence, and the arguments of counsel made during the evidentiary hearing held on June

1, 2017, the court **grants** Defendant's Motion to Suppress (Doc. 33), filed April 25, 2017; and

**denies as moot** Defendant's Motion for Severance (Doc. 52).

## I.    Factual and Procedural Background

Defendant Morris Burrell Haynes ("Defendant" or "Haynes") was arrested on June 26, 2015,

by Dallas Police Department ("DPD") officers for solicitation of prostitution, a Class B misdemeanor

under Texas law.[2]  On this date, DPD's Strategic Deployment Bureau was conducting an undercover

prostitution "sting" operation in the 4100 block of Gannon Lane, Dallas, Texas, in a shopping center

parking lot.  DPD Detective Briana Redwine ("Detective Redwine") was working as an undercover

decoy prostitute when she encountered Haynes at approximately 1:15p.m.  Detective Redwine

observed Haynes park the vehicle he was driving in front of a "Wings" restaurant before gesturing

---

[1] Also pending is Defendant's Second Motion in Limine (Doc. 53), filed June 14, 2017, which the court will address by separate order.

[2] Haynes was also charged with Unlawful Possession of a Firearm by a Felon and Unlawful Possession of a Body Armor by a Felon, which, according to the Incident Report, are both misdemeanor offenses under the Texas Penal Code.

for her to approach the vehicle he was driving. A short time later, Detective Redwine signaled nearby uniformed DPD patrol officers to arrest Haynes after he solicited sex from her in exchange for money.

DPD officers Daniel Sullivan ("Officer Sullivan") and Emanuel Paulos ("Officer Paulos") were the uniformed officers who made the arrest. Haynes had stepped out of the silver Lincoln Town Car that he was driving and was standing several feet from the vehicle when he was arrested. After the officers handcuffed Haynes and put him in the back of their patrol car, Officer Sullivan opened the trunk of the Lincoln Town Car using the car key that Officer Paulos had removed from Haynes's pants pocket during a pat down. Officer Sullivan briefly searched the trunk of the vehicle where he found firearms, ammunition, and body armor. Officer Sullivan then gestured to Officer Paulos to join him in looking at the items in the trunk and, a short time later, Officers Sullivan and Paulos gave each other a "high five" before closing the trunk of the vehicle.

No written inventory of the items found in the trunk of the vehicle was prepared at this time by Officers Sullivan or Paulos. Officer Sullivan instead made a mental note of the trunk's contents before he and Officer Paulos transported Haynes and drove the Lincoln Town Car to a nearby "command post" where Haynes and the Lincoln Town Car were "processed" by DPD vice officers. Officers Sullivan and Paulos did not ask Haynes whether there was anyone who could take possession of the Lincoln Town Car before deciding to search it or move it to the "command post." The parties dispute whether Haynes ever requested to have the Lincoln Town Car released to Haynes's cousin, who was dining at the Wings restaurant, or the owner of the vehicle who lived nearby.

Officers Sullivan and Paulos were not aware that Haynes was a convicted felon when they arrested him. Haynes's prior felony convictions[3] were discovered by DPD vice officers who processed Haynes and the Lincoln Town Car at the "command post." Officer Sullivan assisted DPD vice officers with the second search of the Lincoln Town Car at the "command post." After Haynes and the Lincoln Town Car were processed at the "command post," Haynes was transported to the Lew Sterrett Jail by Detectives C. Edward and S. Monsisvais, the Lincoln Town Car was towed to the DPD auto pound, and the items seized from the trunk of the Lincoln Town Car were transported to the Baylor Street property room where Special Agent Selwyn DeLoach from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took possession of them.

On June 29, 2015, ATF agents obtained a warrant via a criminal complaint to arrest Haynes for being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On July 1, 2015, ATF agents searched 8081 Marvin D. Love Freeway, Apartment 418, Dallas, Texas, the home address provided by Haynes when he was arrested on June 26, 2015. During a sweep of the apartment, agents found the following firearm-related items in plain view: a Glock pistol case that contained three Glock magazines, a Glock pistol backstrap, and a Glock manual; and next to the Glock pistol case was a box containing 89 rounds of .380 caliber ammunition and an empty box for .40 caliber ammunition. The agents also found a loaded Springfield, model XD, .40 caliber pistol, bearing serial number US37933, in a bedroom believed to be occupied by Haynes. Haynes was not

---

[3] Haynes's prior felony convictions include the following: (1) Unlawful Possession of Firearm by a Felon, Cause No. F-1050799, on July 2, 2010; (2) Unlawful Possession of Firearm by a Felon, Cause No. F-0854443, on July 2, 2010; (3) Possession of Metal or Body Armor, Cause No. F-0424458, on May 25, 2005; and (4) Aggravated Assault with a Deadly Weapon (Firearm), Cause No. F-0271122, on May 25, 2005.

home when the search of the apartment was conducted. He was subsequently arrested in Mississippi on December 20, 2016.

On January 24, 2017, a one-count federal indictment charged Haynes with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). The Indictment lists the firearms seized on June 26, 2015, as well as the Springfield, model XD, .40 caliber pistol, bearing serial number US37933 that was seized on June 29, 2015. On April 28, 2017, Haynes moved to suppress all evidence seized as a result of the searches of the Lincoln Town Car on June 26, 2015. The court conducted a hearing on the Motion to Suppress on June 1, 2017, at which Detective Redwine, Officers Sullivan and Paulos, Haynes, and Brandy Louy, a friend of Haynes, all testified. The court discusses herein the testimony that it believes to be pertinent to the resolution of the Motion to Suppress.

At the end of the hearing on the Motion to Suppress, Haynes's counsel indicated that he intended to file a motion to sever the Springfield, model XD, .40 caliber pistol, bearing serial number US37933 listed in Count 1 of the Indictment because it was seized on a different date. The Government responded that the inclusion of this firearm in the same count was a mistake but indicated that this issue would be moot because a superseding indictment was being filed that would list this firearm in a separate court. The Government also noted that a grand jury was scheduled to convene the following week regarding this count.

On June 6, 2017, a three-count Superseding Indictment was filed against Haynes, charging him in Count 1 with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), for the firearms seized on June 26, 2015; Count 2 with Possession of Body Armor by a

Violent Felon in violation of 18 U.S.C. § 931(a)(1), for the body armor seized on June 26, 2016; and

Count 3 with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1),

for the Springfield, model XD, .40 caliber pistol, bearing serial number US37933, seized on July 1,

2015.  On June 13, 2017, Defendant filed his Motion for Severance, and on June 14, 2017, he filed

a Second Motion in Limine.

## II.     Motion to Suppress Evidence Seized From Lincoln Town Car (Doc.  33)

Haynes contends that all evidence seized from the Lincoln Town Car on June 26, 2015,

should be suppressed because the impoundment and warrantless searches of the vehicle on that date

were done in violation of the Fourth Amendment.

### A.     Defendant's Grounds for Suppression

In his Motion to Suppress, Haynes contends that the warrantless searches and seizure of the

vehicle he was driving and the weapons found in trunk of the vehicle were illegal because: (1)

contrary to the DPD Incident Report, the search was not done pursuant to a "traffic stop" or "incident

to arrest"; and (2) any search classified as an "inventory search" was not done in accordance with

DPD policy.  Def.'s Mot. 1-2.  Haynes contends no traffic stop occurred because, when he was

approached and arrested by DPD officers for the solicitation of prostitution offense, the vehicle he

was driving was not moving; rather, it was parked, turned off, and locked, and he was outside of the

vehicle, walking toward a "Wings" restaurant. Haynes further asserts that the solicitation of

prostitution offense for which he was charged is not a traffic violation or violation of the Texas

Transportation Code that would justify or provide probable cause for a traffic stop.  Haynes also

disputes the statement in the DPD Incident Report that any firearms were visible or sticking out of the duffle bag that was in the trunk of the vehicle.

Haynes further contends that, contrary to the DPD Incident Report, the initial search of the vehicle at the scene of his arrest could not have been done "incident to arrest" because: (1) he was not close to or within reaching distance of the vehicle when arrested and he was already handcuffed and placed in the back of a patrol car when the trunk was searched; and, (2) it was unreasonable for the officers to believe that they would find evidence of the charged offense (solicitation of prostitution) in the vehicle. Haynes, therefore, asserts that the search of the vehicle trunk that was conducted by officers "who reached into [his] pocket to remove the [car] keys," was not a valid search incident-to-arrest search. Def.'s Mot. 4.

In addition, Haynes contends that the later alleged inventory search conducted by DPD officers was improper because it was done for the purpose of uncovering evidence rather than a permissible purpose such as protecting Defendant's property while in police custody, protecting police from claims of stolen property, or protecting police from dangerous items. Haynes contends that there was no need to impound his car and inventory it because: (1) the vehicle did not contain evidence of the charged offense (solicitation of prostitution); (2) the vehicle was locked and parked in a private parking lot that was not a "No Parking Tow Away" zone; and (3) there is no indication that the parking lot owners requested the vehicle to be removed. Haynes testified that he never consented to the search of the vehicle and asked the arresting officers if he could ask someone nearby to take the car, so it would not have to be impounded. According to Haynes, either his cousin, who

was inside the Wings restaurant, or a friend who was nearby (the owner of the vehicle)[4] could have taken custody of the vehicle, and this would have obviated the need for the officers to impound it. *Id.* at 4.

Finally, Defendant contends that the alleged inventory search was not done in accordance with DPD procedure. In this regard, Defendant contends that DPD's Patrol Bureau, Standard Operating Procedure, 2013 Impounding Vehicles ("DPD Patrol Procedure") for impounding and inventorying vehicles requires officers to inventory at the scene vehicles to be impounded and "ensure that all vehicle information on the wrecker log is filled out properly,"[5] whereas the alleged inventory search of his vehicle he was driving did not occur until after it was transported by a DPD officer from the location of his arrest to the "command post." Haynes also contends that information regarding the wrecker transport of the vehicle in the DPD Incident Report was left conspicuously blank. Haynes contends that he has requested a copy of the Impound Vehicle Receipt ("IVR") for the Lincoln Town Car but has yet to receive it. Haynes also contends that no video or audio surveillance of the events has been provided to him. Haynes maintains that the reference in the DPD Incident Report to the search as an "inventory search incident to arrest" is further proof that the search was actually an impermissible evidentiary search of the vehicle that was motivated by a desire to uncover incriminating evidence.

---

[4] As herein explained, the contention in Haynes's motion that the vehicle could have been released to a nearby friend refers to a person named "Bro." According to Haynes's testimony, Bro was the cousin of a friend who lived in the same apartment complex as Haynes that is located close to the shopping center where he was arrested.

[5] *Id.* at 11 (quoting Def.'s Ex. C, DPD Patrol Procedure at A.1)

**B.	Government's Response to Motion to Suppress**

The Government does not address Defendant's contentions regarding the occurrence or validity of any traffic stop or search incident to an arrest.  The Government instead argues that the impoundment and warrantless search of the vehicle were appropriate under the "community caretaking" and inventory exceptions to the Fourth Amendment's prohibition against unreasonable warrantless searches and seizures, and the impoundment and inventory search of the vehicle were done in accordance with DPD's procedures for impounding and inventorying vehicles.  Regarding the impoundment of the Lincoln Town Car, the Government contends that Officers Sullivan's and Paulos's decision to impound the vehicle pursuant to their "community caretaker" function was reasonable because Haynes never informed the officers of his desire to release the vehicle to a third party who could lawfully take possession of the vehicle.  In addition, the Government asserts that, because Haynes was not the owner of the vehicle, the officers were not obligated under DPD Patrol Procedure to honor any request by him to release the vehicle since there was no indication that the owner had entrusted the vehicle to anyone else; or that the unnamed third party had a valid license and insurance as required by DPD Patrol Procedure.  Pl.'s Resp.  6-7 & n.4 (citing *United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012)). The Government further asserts that, even though the vehicle was lawfully parked and did not pose a safety risk to the public, the officers' decision to impound the Lincoln Town Car, which was equipped with expensive tire rims, was proper because they were concerned that the vehicle would be stolen or vandalized if left in the restaurant parking lot, which was located in a "high crime area."  The Government, therefore, contends that the facts of this case are similar to those in *United States v. Staller*, 616 F.2d 1284 (5th Cir. 1980), in which

the Fifth Circuit upheld a police officer's decision to impound a vehicle under the "community caretaking" exception.

The Government contends that an inventory search of the Lincoln Town Car was appropriate in light of the officers' decision to impound the vehicle and was done in accordance with DPD Patrol Procedure for inventorying impounded vehicles, which is a constitutionally adequate policy that does not violate the Fourth Amendment because it "sufficiently limit[s] the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches." Pl.'s Resp. 7 (quoting *McKinnon*, 681 F.3d at 210). The Government asserts that the limitation in DPD Patrol Procedure "on the types of containers that can be searched, and the requirement that the officer complete the tow company's IVR, help prevent an inventory from becoming an evidentiary search." Pl.'s Resp. 8. Additionally, the Government contends that the clear language of the DPD Patrol Procedure for inventorying impounded vehicles "is consistent with preserving the property of the vehicle's owner, ensuring that the police protect themselves against claims or disputes over lost or stolen property, and protecting the police from danger, legitimate concerns recognized in *McKinnon*." *Id.* at 7.

The Government disagrees with Defendant's contentions that: (1) an inventory search of the vehicle was not done "at the scene" as required by DPD Patrol Procedure; and (2) that there were two separate searches, the second of which was the inventory search. According to the Government, the officers initiated an inventory search of the vehicle at the scene, at which point the trunk of the vehicle was opened and the guns were discovered, and the inventory or processing of the vehicle was completed at the command post after it was transported there by one of the arresting officers. Thus, the Government contends that, in essence, only one inventory search, not two, was conducted of the vehicle with the inventory beginning at one location, the area where Haynes was arrested, and ending

at another, the nearby "command post" where Haynes and the vehicle were transported after Haynes's arrest.

In addition, the Government contends that the officers' transporting the vehicle to the "command post" and conducting or finishing the inventory search of the vehicle at the "command post" comported with DPD procedures for decoy or vice operations ("DPD Decoy Procedure" or "DPD Vice Procedure"), which state that "the command post duties include completing book-in and wrecker sheets." Pl.'s Resp. 9 (citing Pl.'s Ex. B, DPD Standard Operation Procedures, Vice Unit—Arrest Procedure, Decoy Operations, ¶¶ (C)(2)-(3)). The Government further asserts that, when one of the persons in a vehicle is not arrested or the arrested person wishes to release his vehicle to a passenger who is licensed, DPD Decoy Procedure dictates that the officers "MUST STILL GET THE VEHICLE INFORMATION FOR THE ARREST REPORT." Pl.'s Resp. 9 (quoting DPD Decoy Procedure, ¶ (C)(2)(d) (emphasis in original)).[6]

The Government, therefore, maintains that the officers here "followed DPD's established inventory procedures." Pl.'s Resp. 9. Based on *United States v. Walker*, the Government asserts that police officers "are not required to deviate from their standardized procedures on an ad hoc basis for the convenience of suspects," and "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Id.* (quoting

---

[6] From this, the Government appears to contend that the requirement to "get vehicle information for the arrest report" is synonymous with conducting an "inventory search" such that Officers Sullivan and Paulos or DPD vice officers would have been required to conduct an inventory search of the Lincoln Town Car whether it was released or impounded. The court does not address in detail this argument. **Instead, it simply notes that this argument directly contradicts DPD Patrol Procedure, which specifically states that, "A vehicle that is not impounded cannot be inventoried." Def.'s Ex. C; Pl.'s Ex. A (DPD Patrol Procedure ¶ A(1)) (emphasis added).**

*United States v. Walker* 931 F.2d 1066, 1069 (5th Cir. 1991)).  Alternatively, the Government contends that, if the search was improper, the discovery and seizure of the firearms was inevitable following Defendant's lawful arrest for the solicitation of prostitution offense.

### C.    Discussion

It is undisputed that the search or searches of the Lincoln Town Car driven by Haynes on June 26, 2015, were not done pursuant to a warrant.  Further, when cross-examined during the hearing on the Motion to Suppress, Officers Sullivan and Paulos acknowledged that no traffic stop was conducted on the Lincoln Town Car prior to Haynes's arrest, and the searches of the vehicle at the scene of Haynes's arrest and the "command post" were not conducted incident to Haynes's arrest on June 26, 2015, for solicitation of prostitution.  Officer Sullivan also conceded that the facts of this case would not such support a lawful search incident to an arrest.  Both arresting officers instead maintained that the search or searches of the vehicle were lawful inventory searches because the vehicle was impounded pursuant to DPD procedure.  In addition, Officer Sullivan testified on direct examination that impoundment of the vehicle was proper because the area where Haynes was arrested is a "high crime area," and the vehicle could have been stolen or vandalized.

As the Government does not contend that the searches were conducted in conjunction with a traffic stop or done incident to Haynes's arrest, and instead contends that the impoundment and searches of the vehicle were proper under the "community caretaking" and inventory search exceptions, the court need not address Defendant's traffic stop and search incident-to-arrest arguments.  The court's discussion instead focuses on whether the impoundment and searches of the vehicle driven by Haynes on June 26, 2015, fall within the "community caretaking" and inventory exceptions to the Fourth Amendment's prohibition against unreasonable warrantless searches as

contended by the Government. For the reasons herein explained, the court determines, based in large part on the testimony of the arresting officers and Haynes, and the court's credibility determinations as to these witnesses' testimony, or lack thereof, that suppression of the evidence is required because, although impoundment of the vehicle was appropriate under DPD's Patrol and Vice Procedures for impounding vehicles and the "community caretaking" exception, law enforcement did not comply with DPD's procedures for inventorying impounded vehicles, and the Government has not met its burden of establishing that the inevitable-discovery exception to the exclusionary rule applies.

As previously noted, Haynes essentially contends that the impoundment of the vehicle he was driving and the warrantless search of that vehicle violated the Fourth Amendment to the Constitution because DPD officers did not comply with DPD procedure for impounding and inventorying vehicles, and that the facts of this case do not support the impoundment or searches of the vehicle under the "community caretaking" exception. A defendant normally has the burden of proving that the challenged search or seizure was unconstitutional, but when law enforcement officers act without a warrant, the Government bears the burden of proving by a preponderance of the evidence that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). Under the Fourth Amendment, "[w]arrantless searches and seizures are 'per se unreasonable unless they fall within a few narrowly defined exceptions.'" *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002) (quoting *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001)). Two exceptions include the "community caretaking exception," *United States v. McKinnon*, 681 F.3d 203, 208 (5th Cir. 2012), and the inventory exception, *United States v. Hahn*, 922 F.2d 243, 246 (5th Cir. 1991).

### 1.    Reasonableness of Impoundment for Community Caretaking Purpose

The "community caretaking" exception originates from the Supreme Court's opinion in *South Dakota v. Opperman*, 428 U.S. 364 (1976). *McKinnon*, 681 F.3d at 208. Impoundments by police officers may be done to further "public safety" or "community caretaking functions," such as removing "disabled or damaged vehicles," and "automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *Id.* (quoting *Opperman*, 428 U.S. at 368). The "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *McKinnon*, 681 F.3d at 208 (quoting *Opperman*, 428 U.S. at 369). Based on this rationale, the Fifth Circuit has held that the impoundment of an arrested person's vehicle is permissible under the "community caretaking" exception. *See, e.g., McKinnon*, 681 F.3d at 208-09; *United States v. Staller*, 616 F.2d 1284, 1289-90 (5th Cir. 1980).

In interpreting *Opperman*, the Supreme Court has stated regarding the "community caretaking" exception:

> Nothing in *Opperman* [ ] prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Here, the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it.

*McKinnon*, 681 F.3d at 208 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). Since *Opperman* and *Bertine*, the Fifth Circuit has focused "on the reasonableness of the vehicle impoundment for a community caretaking purpose without reference to any standardized criteria" and held that impoundment of a vehicle is "permissible so long as it was carried out in furtherance

of a community caretaking function." *McKinnon*, 681 F.3d at 208 (quoting *United States v. Castro*, 166 F.3d 728, 734 (5th Cir. 1999)) (en banc); and citing *United States v. Ponce*, 8 F.3d 989, 996 (5th Cir. 1993), for proposition that the "community caretaking" exception is applied "without reference to standard criteria")). Whether the "community caretaking" exception applies ultimately turns on "the reasonableness of the 'community caretaker' impound viewed in the context of the facts and circumstances encountered by the officer." *McKinnon*, 681 F.3d at 208 (citing *Cooper v. California*, 386 U.S. 58, 59 (1987)). The reasonableness of law enforcement's decision to impound a vehicle for "community caretaking" can also turn on whether police officers followed applicable local procedures established for impounding vehicles. *See, e.g., Ponce*, 8 F.3d at 995-96 (footnote omitted) ("Furthermore, Officer Nichols' decision to impound the pickup truck did not contravene the Austin Police Department procedures. The procedures authorized impoundment when '[t]he operator has been arrested and there is no responsible adult present to immediately take custody of the vehicle.'"). An officer's "ulterior motive to search" does not invalidate an otherwise-lawful impoundment executed in accordance with standard procedures established by the police department. *McKinnon*, 681 F.3d at 210.

The Government's impoundment argument focuses on whether the arresting officers' decision to impound the vehicle driven by Haynes was reasonable in light of DPD Patrol Procedure for impounding vehicles and certain "community caretaking" factors such as whether the arrest location was a "high crime area." DPD Patrol Procedure states the following regarding impoundment of vehicles:

<u>2103 IMPOUNDING VEHICLES</u>

A.   Basis for Impoundment

    1.   Impounding a vehicle is a "seizure" under the Fourth Amendment. To be lawful, it must be a reasonable impoundment. A vehicle that is not impounded cannot be inventoried.

        a.   Officers must ensure that all vehicle information on the wrecker log is filled out properly.

        b.   Vehicles to be impounded will not be taken to the Division Stations, but will be sent directly to the Auto Pound.

        . . . .

    2.   A vehicle may be impounded under the following circumstances:

      . . . .

        l.   The vehicle driver is arrested.

B.   Vehicles in Which the Driver is Arrested:

    1.   When a person is placed under arrest while operating a motor vehicle, the vehicle will normally be impounded, and an inventory search will be conducted prior to the vehicle being towed by a city contract wrecker.

    2.   If the driver is arrested and is competent to make the decision, officers will give the driver the opportunity to release the vehicle to a passenger or third party, as long as the vehicle is insured, that person is at the scene, has a valid driver's license, and is not intoxicated or under arrest. If the vehicle is to be release to another party, no inventory search may be conducted. When the vehicle is released to a passenger or third party, that information will be recorded in the arrest report.

Def.'s Ex. C; Pl.'s Ex. A (DPD Patrol Procedure ¶¶ A-B).

Haynes contends that impoundment of the Lincoln Town Car was improper because the vehicle he was driving was locked and parked in a private parking lot that was not a "No Parking

Tow Away" zone; and there was no indication that the parking lot owners requested the vehicle to be removed.[7]

In *Staller*, however, the Fifth Circuit rejected a similar argument by the defendant that "the police are neither required nor entitled to take custody of a vehicle legally parked in a mall parking lot" and concluded that impoundment of the vehicle driven by the defendant was lawful after the defendant was arrested because he was from out of state, had been taken to jail and was not likely to return to his vehicle soon, and had no known responsible adults who could take custody of the vehicle, and because the vehicle was parked in a mall parking lot where there was a high risk of vandalism or theft. *Staller*, 616 F.2d at 1289-90. In *Ponce*, the Fifth Circuit also concluded that the

---

[7] Haynes also contends with respect to his traffic stop and search incident-to-arrest arguments that the impoundment and searches of the vehicle were unlawful because he was not driving or operating the vehicle when arrested. As noted, the court need not address Haynes's traffic stop and incident-to-arrest arguments because the Government does not rely on these grounds as a basis for supporting the impoundment and searches of the vehicle. Haynes does not appear to contend that impoundment of the vehicle was improper under DPD Patrol Procedure because he was not operating the vehicle when arrested, **and the court concludes that any such contention would fail**. DPD Patrol Procedure states, "[w]hen a person is placed under arrest while operating a motor vehicle, the vehicle will normally be impounded." Def.'s Ex. C ¶ (B)(1). The preceding paragraph also addresses circumstances in which a vehicle may be impounded, including when "the vehicle driver is arrested" but does limit or address impoundment in terms of whether a person is placed under arrest *while operating the vehicle*. *Id.* ¶ (A)(2)(l). Moreover, the Fifth Circuit rejected a similar argument by the defendant and dissenting judge in *Ponce* with respect to a similarly worded Austin Police Department impoundment procedure and determined that the procedure did not preclude impoundment of the vehicle, even though the defendant was not actually "operating" the vehicle when arrested because the arresting officers were aware that the defendant had driven the vehicle to the location where he was arrested, and the defendant had the keys to the vehicle in his pocket:

> Our holding does not, as the dissent suggests, stand for "the proposition that, if a person who is arrested has keys to a vehicle in his pocket, the arresting officer may locate that vehicle and impound and search it, even though the person arrested was not in the vehicle at the time of arrest." In this case, Officer Nichols arrested Ponce at the Austin parole office, asked him whether he had driven to that location, received an affirmative answer, found car keys in his pants pocket, and then ascertained that the vehicle was in an open public parking lot adjoining the parole office building. Apparently, if Ponce had left the parole office, entered his truck, turned the ignition key, and then been arrested, the dissent would find the officer's decision to impound the truck less objectionable. We see no significant distinction between the two situations, nor any reason to construe "operator" so narrowly as to permit impoundment in the latter, but not the former.

*Ponce*, 8 F.3d at 995-96 & n.6.

officer acted appropriately in impounding a vehicle that was parked in a public parking lot upon the defendant's arrest. *Ponce*, 8 F.3d at 996.

Here, Haynes testified he lived nearby, and Officer Sullivan acknowledged that the Lincoln Town Car was moveable and not illegally parked or impeding traffic, and there was no indication that the vehicle was involved in another crime. Officer Sullivan also persuasively testified, based on his personal knowledge from working as a "rookie officer" in the area where Haynes was arrested, that the area is a "very high crime beat" with a large amount of crime "ranging from prostitution, stolen cars, ["burglary of a motor vehicle"], and gang related issues." Officer Sullivan testified that he did not give much consideration to leaving the vehicle where it was parked because Haynes was under arrest for solicitation of prostitution, there was no one present to whom the vehicle could be released pursuant to DPD Patrol Procedure, and the vehicle could be "easily stolen or put up on cinder blocks real quick," as it was a "very high crime area."

Haynes disputes the Government's contention that no one was present who could have taken the vehicle. According to Haynes, either his cousin, who was inside the Wings restaurant, or the vehicle's owner who lived nearby could have taken custody of the vehicle, and this would have obviated the need for the officers to impound it. Def.'s Mot. 4. Haynes further asserts that he never consented to the search of the vehicle and "asked the arresting officers if he could ask someone nearby to take the car," so it would not have to be impounded. In this regard, Haynes testified as follows during the Motion to Suppress hearing: (1) the apartment where he resides is close to the shopping center where he was arrested; (2) he borrowed the Lincoln Town Car from a person named "Bro," who was the cousin of his friend Justin that lived in the same apartment complex; (3) after he was arrested, but before being placed in the back of the police patrol car, he asked Officer Paulos

if he could call Bro, the owner of the Lincoln Town Car, to come get the vehicle, and Officer Paulos responded that the vehicle's owner could not take the vehicle because he was not present; (4) he then asked Officer Paulos if his cousin Shaniqua, who was inside the Wings restaurant, could take the vehicle, and Officer Paulos responded, if Shaniqua was not the owner of the vehicle, she could not take the vehicle. Officer Sullivan testified that he was not aware that Haynes had talked to Officer Paulos and requested to release the vehicle to Bro or someone inside the Wings restaurant. Both officers acknowledged that they did not ask Haynes if he wanted to release the vehicle to a third party before making the decision to impound the vehicle because there was no one present when he was arrested.

The court determines that the officers' decision in not asking Haynes whether he wanted to release the vehicle to a third party was reasonable, as DPD Patrol Procedure only requires officers to give the driver of a vehicle the opportunity to release the vehicle to a passenger or third party who "is at the scene," and it is undisputed that Haynes was alone in the Lincoln Town Car when first observed by Detective Redwine, and he was not accompanied by anyone when arrested by Officers Sullivan and Paulos. Def.'s Ex. C ¶ B(2). For the same reason, Officer Paulos's denial of Haynes's request to call Bro, the vehicle's owner, to come get the vehicle was reasonable in light of DPD Patrol Procedure because, although Bro lived nearby, he was not "at the scene" when Haynes was arrested. *See id.*

Moreover, both officers testified that the quick removal of vehicles from the scene of arrest was "standard practice" and a "big factor" in vice operations because lingering at the scene could draw attention to and undermine the undercover operation. The officers' testimony regarding the standard practice in vice operation to move vehicles is supported by DPD Decoy Procedure, which

states that one uniformed officer will transport the arrested suspect to the command post and "[t]he other uniformed officer will drive the suspect's vehicle back to the command post."[8]  Pl.'s Ex. B ¶ (C)(2)(d)(1)-(2).  In addition, the procedure for releasing vehicles under DPD Decoy Procedure is more limited than DPD Patrol Procedure in that it only contemplates the release of a vehicle to a licensed passenger.  *See id.* ¶ (C)(2)(d)(3).  Thus, even if the owner of the vehicle lived in a nearby apartment complex, the decision to impound the vehicle instead of waiting for the owner to retrieve the vehicle was not unreasonable.

Further, while Haynes was arrested in front of the Wings restaurant, and the court found credible his testimony that he asked Officer Paulos to release the vehicle to his cousin, who was dining inside the Wings restaurant, Officer Paulos's decision to not release the vehicle to Haynes's cousin or anyone inside the restaurant was reasonable under the circumstances because neither Haynes nor these other persons were the owner of the Lincoln Town Car, and there is no evidence that Bro, the vehicle's owner, would have approved the release of his vehicle to someone other than Haynes, who was allowed to borrow the vehicle to pick up some food at Wings.  *See, e.g.*, *Ponce*, 8 F.3d at 996 (concluding that, even if the officer believed that Ponce's brother-in-law, the vehicle's owner, had entrusted the truck to Ponce, the officer was not required to assume that the Ponce's brother-in-law would also entrust his truck to Ponce's girlfriend); *McKinnon*, 681 F.3d at 209 ("It is clear that Toler, the vehicle owner, was not present to designate a tow operator. And, even

---

[8]  Even if not supported by DPD's written policy and procedures, there is no requirement that a police department's inventory policy be written.  *Walker*, 931 F.2d at 1069.  Thus, the defense's cross-examination of the arresting officers, which focused on whether the arresting officers' testimony regarding standard practice in vice operations was reflected in the wording of the written DPD Decoy Procedure is not necessarily dispositive of whether the conduct of the DPD officers in this case in searching the Lincoln Town Car complied with DPD procedure for inventorying impounded vehicles.

assuming that Toler entrusted her vehicle to McKinnon, there is nothing in the record to suggest that

Toler also entrusted her vehicle to Momoh, Higgins, or anyone else for that matter. Therefore,

viewing the evidence in the light most favorable to the Government, Zia's decision to impound the

vehicle was reasonable under the Fourth Amendment.").   Additionally, according to Haynes's

testimony, Officer Paulos was aware that Bro, and not Haynes's cousin or friend, was the owner of

the vehicle because Haynes told Officer Paulos that Bro was the vehicle's owner. *See Ponce*, 8 F.3d

at 996 (noting that the officer knew that Ponce did not actually own the truck).

Based on the foregoing facts and circumstances encountered by Officers Sullivan and Paulos

and found by the court based on the testimony of these officers and Haynes, the court concludes that

the decision to impound the Lincoln Town Car driven by Haynes after his arrest was reasonable as

a "community caretaker' impound and in light of DPD's Patrol and Decoy Procedures. *See*

*McKinnon*, 681 F.3d at 208; *Ponce*, 8 F.3d at 995-96.   The court, therefore, considers whether the

searches of the vehicle violated the Fourth Amendment.

### 2.      Inventory Search

Haynes maintains that, contrary to the Government's contention, the searches of the Lincoln

Town Car the vehicle were unconstitutional under the Fourth Amendment because the circumstances

surrounding the searches indicate that the searches were conducted for evidentiary purposes, not to

inventory the contents of the vehicle, and the searches of the vehicle did not comply with DPD's

Patrol Procedure for inventorying vehicles.

"[A]n inventory search must not be a ruse for a general rummaging in order to discover

incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).   To prevent inventory searches from

being used as "a ruse for a general rummaging . . . to discover incriminating evidence [,] . . .

inventories [must] be conducted according to standardized criteria"[9] that is "consistent with the proper purpose of a noninvestigative inventory search."[10]  Thus, an inventory search of a seized vehicle is reasonable and does not violate of the Fourth Amendment if it is "conducted pursuant to standardized regulations and procedures that are consistent with: (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999). To prevent inventory searches from becoming evidentiary searches, the standardized procedures and regulations must "sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches." *United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994) (citation omitted).

Haynes's motion does not address the constitutional adequacy of DPD's policy or procedure for inventorying impounded vehicles.  The court, therefore, considers only his contention that the officers did not comply with DPD's standard procedures for inventorying impounded vehicles. Pursuant to DPD Patrol Procedure,

A vehicle that is not impounded cannot be inventoried.

    a.    Officers must ensure that all vehicle information on the wrecker log is filled out properly.

    b.    Vehicles to be impounded will not be taken to the Division Stations, but will be sent directly to the Auto Pound.

. . . .

---

[9] *Walker*, 931 F.2d at 1068 (citation omitted).

[10] *United States v. Privett*, 68 F.3d 101, 103 (5th Cir. 1995).

D.    Searching and Inventorying Vehicles

1.    In all cases where a vehicle is to be impounded, it will [be] searched by the impounding officer at the scene. . . .

2.    . . . [F]irearms, and high-dollar valuables will not be left in the impounded vehicle. The impounding officer will remove the items and will place them at the Property Unit in accordance with Property Unit procedures.

3.    When inventorying a vehicle, all unlocked containers found in the vehicle are to be inspected and inventoried. A locked container may be inventoried only if the officer can do so without damaging the container or breaking the lock. A "locked container" is any object capable of holding other objects, including but not limited to: bags, boxes, briefcases, consoles, glove compartments, or luggage.

4.    The officer will accurately and completely record on the wrecker Driver's Impounded Vehicle Receipt (IVR) all of the information that is required to be filled out by the officer, as indicated by the red ink print. This information includes:

    a.    A description of the vehicle

    b.    Name and badge number of the impounding officer

    c.    Reason for impoundment

    d.    Location, date, and time of impoundment

    e.    Driver's and owner's name/address

    f.    Condition of the vehicle (note damage location and extent of damages and missing parts—if any)[]

    g.    [Whether the vehicle is driveable]

    h.    Circling of applicable inventory items and addition of any unusual or notable property items

Pl.'s Ex. A ¶¶ A, D.  Defendant contends that this procedure was not followed because arresting

Officers Sullivan and Paulos did not search the Lincoln Town Car at the scene where he was

arrested, although DPD Patrol Procedure requires the impounding officer to inventory the vehicle at the scene. Defendant contends that the vehicle was instead moved to another location and searched at the "command post" by officers who were not the arresting or impounding officers. In addition, Defendant contends that there is no evidence that the officers completed a wrecker's log or IVR as required by DPD Patrol Procedure.

In response to the Motion to Suppress, the Government appears to contend that DPD procedure for inventorying vehicles was followed if the officers' conduct is viewed in context of the DPD Patrol Procedure, as well as Decoy Procedure, which applies to decoy vice operations such as the one that resulted in Haynes's arrest for solicitation of prostitution. DPD Decoy Procedure states in pertinent part:

> 2.    Operational Procedures
>
> . . .
>
> d.    Arrest Made/Suspect in Custody:
>
> > 1)    Once the arrest is made, one of the uniformed officers will transport the suspect back to the command post for processing.
> >
> > 2)    The other uniformed officer will drive the suspect's vehicle back to the command post.
> >
> > 3)    In the event the driver is not arrested (case made on passenger) or he wishes to release his vehicle to a passenger that is licensed YOU MUST STILL GET THE VEHICLE INFORMATION FOR THE ARREST REPORT.
>
> 3.    Command Post Operations
>
> > a.    Book in officer will be responsible for maintaining accurate records indicating which decoy officer was responsible for the arrest.

. . .

      d.      The assigned wrecker person will complete all necessary forms and call wreckers as needed. It is less confusing and easier on the service desk if multiple wreckers are called at once. This can be done after several arrests have been made or at the end of the operation.

      e.      Once the operation is completed[,] the prisoners will be transported to Lew Sterrett and the command post will deactivate. Command post personnel will ensure that all of the prisoner's vehicles have been removed to the auto pound.

Pl.'s Ex. B 13-14. The Government contends that the officers complied with DPD Patrol Procedure because Officer Sullivan initiated the search of the vehicle at the scene where Haynes was arrested. The Government maintains that the search of the vehicle was continued and completed at the "command post" in accordance with DPD Decoy Procedure, which required uniformed Officers Sullivan and Paulos to transport Haynes and the vehicle to the "command post" for processing. The Government also notes that, under DPD Decoy Procedure, "command post duties include completing book-in and wrecker sheets." Pl.'s Resp. 9. When pressed by defense counsel, Officers Sullivan and Paulos pointed to this same language in the DPD Decoy Procedure, in addition to the language requiring the movement of the arrested suspect's vehicle to the "command post," to support their testimony that inventory of the vehicle at the "command post" was done in accordance with DPD Decoy Procedure, even though the procedures for decoy operations do not specifically refer to impounding or inventorying vehicles, whether at the scene or the "command post."

In addition, Officer Sullivan testified that, because this was a vice operation, DPD Decoy Procedure applied, and he inadvertently violated DPD Decoy Procedure by starting the inventory

search at the scene, instead of the "command post." Officer Sullivan explained that he started to inventory the Lincoln Town Car at the scene because, as a uniformed patrol officer, he was accustomed to following DPD Patrol Procedure, which requires inventorying impounded vehicles at the scene, but he realized shortly after starting the inventory search at the scene that he should be following vice protocol because this was a vice operation. According to Officer Sullivan, vice procedure required the transport of impounded vehicles to the "command post" where officers stationed at the "command post" inventory vehicles and complete required paperwork.

Officer Sullivan testified that he and other vice officers inventoried the Lincoln Town Car at the "command post." Officer Paulos confirmed that he saw Officer Sullivan and others searching the vehicle at the "command post." Officer Sullivan and Officer Paulos testified that they did not fill out an "inventory sheet" for the vehicle or write down anything, either at the scene or the "command post," but they saw another vice officer fill out a "wrecker sheet" at the "command post." Neither knew the name of the officer who filled out the "wrecker sheet" and does not know where the wrecker sheet is. Officer Paulos conceded that the vehicle was not inventoried by the "impounding officer" as required by DPD Patrol Procedure and testified that the person or officer who filled out the paperwork or wrecker sheet was not always the same. Officer Sullivan similarly acknowledged that certain DPD Patrol Procedures for inventorying vehicles were not followed but insisted on cross-examination that he had complied with *all* DPD Patrol and Decoy or Vice Procedures for inventorying impounded vehicles and did not ignore or disregard any procedure. Officer Sullivan's testimony as to which procedures he was following and which procedures applied to inventory searches in situations such as this involving a vice operation was not consistent. On one

hand, he testified that, because this was a vice operation, patrol policy for inventorying vehicles did not apply; on the other hand, he indicated that all procedures were in place and they were operating under both Patrol and Vice Procedures for inventorying vehicles in searching the Lincoln Town Car.

After considering DPD's Patrol and Decoy Procedures and Officer Sullivan's and Officer Paulos's testimony, the court concludes that DPD's procedure for inventory searches of impounded vehicles was not followed. Even assuming, as Officers Sullivan and Paulos testified, that the procedures for conducting inventory searches in DPD vice operations differ slightly from those for patrol operations in that the vehicle of the arrested person is moved to and searched at the "command post" rather than at the scene of the arrest, and the officer conducting the inventory search in a vice operation is not always the same and is not the impounding or arresting officer, the court heard no testimony from which it can reasonably infer that officers in vice operations are relieved of complying with DPD's standardized Patrol Procedures for "accurately and completely record[ing] on the wrecker Driver's Impounded Vehicle Receipt (IVR) all of the information that is required to be filled out by the officer," including:

a. A description of the vehicle

b. Name and badge number of the impounding officer

c. Reason for impoundment

d. Location, dated, and time of impoundment

e. Driver's and owner's name/address

f. Condition of the vehicle (note damage location and extent of damages and missing parts—if any)[]

g.    [Whether the vehicle is driveable]

h.    Circling of applicable inventory items and addition of any unusual or notable property items

Pl.'s Ex. A ¶ (D)(4)(a)-(h). The court also heard no testimony that discovery of contraband during an inventory search in a vice operation entitled DPD officers to deviate from or disregard inventory procedure and convert an alleged inventory search, which is meant to protect the contents of the vehicle and the police against claims, into an investigatory search for evidence of criminal conduct.

It is undisputed that no IVR was filled out in this case, although, as previously noted, the Government points to the inclusion of the IVR requirement in DPD's Patrol Procedures for inventorying impounded vehicles to support its contention that the procedure is constitutionally adequate. Both officers testified no IVR was filled out, and the Government conceded when questioned by the court, that, to its knowledge, there was no IVR. According to the Government, after the officers at the "command post" found the firearms and inventoried the vehicle, they did a records search and realized that Haynes was a convicted felon. The Government explained that the firearms in the vehicle were, therefore, seized as evidence and documented in the DPD Incident Report rather than an IVR. There is no witness testimony to support the Government's version of events. Regardless, if, as the Government contends, DPD officers did not discover that Haynes was a convicted felon until *after* conducting an inventory search of the vehicle at the "command post," an IVR or similarly detailed record of the property in the vehicle should have been made for inventory rather than evidentiary purposes, but this was not done.

The Government further argued that, although no IVR was completed, a wrecker sheet was completed at the "command post" for the Lincoln Town Car. As noted, Officers Sullivan and Paulos testified similarly that a wrecker sheet was filled out by a vice officer at the "command post," but neither knew the name of the officer. The Government offered into evidence Government Exhibit 4, which according to the Government, was a copy of the wrecker sheet for the Lincoln Town Car. The defense objected to the admission of the exhibit, and the court sustained the objection because, after reviewing the document, the court determined that it was not helpful in deciding the issue, as the document was mostly illegible and was only partially completed. Moreover, the document did not include any reference to the firearms or body armor found and seized by DPD officers during the alleged inventory search, although items of this nature would seem particularly "unusual or notable." *Id.* ¶ (D)(4)(h). The Government also conceded that this document or wrecker sheet *included only items not seized that remained in the vehicle when it was towed to the DPD auto pound*. In other words, this document does not list any of the property seized as evidence as a result of the search. The searches of the Lincoln Town Car, therefore, did not comply with DPD's procedures for inventorying impounded vehicles. *See id.* Moreover, that the only record of the firearms seized from the vehicle is found in the DPD Incident Report or police report, which refers to this property as "EVIDENCE," Def.'s Ex. A (Doc. 33-1 at PageID 78-79), is another indication that the search of the vehicle was investigatory in nature and done to discover incriminating evidence instead of inventorying and recording the contents of the vehicle to safeguard the property of the vehicle's owner and protect the police against claims or disputes over lost or stolen property. *See Lage*, 183 F.3d at 380. Accordingly, for all of these reasons, the court concludes that the searches of the

Lincoln Town Car on June 26, 2015, do not fall within the inventory exception to warrantless searches, and all evidence seized must be suppressed unless the Government can establish that the inevitable discovery exception to the exclusionary rule applies.

### 3. Inevitable Discovery Exception

"The inevitable discovery doctrine applies if the Government demonstrates by a preponderance of the evidence that . . . there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct." *United States v. Ochoa*, 667 F.3d 643, 650 (5th Cir. 2012) (quoting *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008)).

The Government contends that, even if the search of the Lincoln Town Car was unlawful, the discovery and seizure of the firearms was inevitable following Defendant's lawful arrest for the prostitution offense because:

> the police lawfully impounded the vehicle and lawfully opened the trunk to conduct an inventory in the parking lot where Haynes was lawfully arrested. There, the officer observed two rifle cases and a rifle protruding from the duffle bag, giving cause to believe that Haynes possessed firearms. The police, therefore, would quickly discover that Haynes was a multi-convicted felon—as they did—and, thus, he was barred from possessing firearms. In fact, the police charged Haynes with being a convicted felon in possession of a firearm in addition to the prostitution offense. Hence, assuming that the continuation of the inventory at the command post was improper, the firearms and related evidence found in the trunk would have been lawfully seized once the police discovered that Haynes was a convicted felon.

Pl.'s Resp. 11-12 (citing *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006), for the proposition, "The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband.").

The Government's reliance on *Fields* and the automobile exception to warrantless searches to support its inevitable discovery argument is misplaced. *Fields* did not involve an inevitable discovery issue. Moreover, the automobile exception, which allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband, is inapplicable because there is no evidence that DPD officers had probable cause to believe that the Lincoln Town Car contained contraband after conducting a record search and discovering that Haynes was a convicted felon; rather, as noted above, the Government concedes that the firearms in the vehicle were found as a result of the unlawful inventory search before discovering that Haynes was a convicted felon. Thus, this argument is insufficient to show that there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct. *See Ochoa*, 667 F.3d at 650.

During the suppression hearing, the Government also argued that, even if the police officers should have inventoried the Lincoln Town Car at the scene of Haynes's arrest as contended by the defense, the evidence seized from the Lincoln Town Car would have been discovered during a lawful inventory of the vehicle later that night because the impoundment of the vehicle was lawful. "[A]n inventory search of a seized vehicle is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with: (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *Zavala*, 541 F.3d at 579 (5th Cir. 2008) (quoting *United States v. Hope*, 102 F.3d 114, 116 (5th Cir. 1996)). The Fifth Circuit has "recognized that evidence initially seized improperly should not be suppressed if it would have

been discovered pursuant normal police practices." *Ochoa*, 667 F.3d at 650 (citing *United States v. Seals*, 987 F.2d 1102, 1108 (5th Cir. 1993); and *Castro*, 166 F.3d at 734).

As explained, the court's determination that DPD procedure for inventory searches was not followed did not turn on the location of where the Lincoln Town Car was searched. The court instead focused on the failure of the police to comply with DPD inventory procedure that an officer accurately and completely record on an IVR information regarding the vehicle, owner and driver of the vehicle, reason for impoundment, and unusual or notable property items found in the vehicle, and it reasoned that law enforcement's decision to only make a record of the firearms seized in a police Incident Report for evidentiary purposes indicated that the search was for done for investigatory purposes, not inventory purposes.

Moreover, although the Government presented evidence regarding DPD's standard procedures for inventorying impounding vehicles, there is no evidence that such procedures, including the procedure for making an accurate and complete record of information on an IVR, are normally or routinely followed in DPD vice operations, despite not being followed in this instance. *See Ochoa*, 667 F.3d at 650 (concluding that there was reasonable probability that law enforcement would have uncovered evidence during an inventory because "Agent Robertson testified that DEA has standard operating procedures calling for an inventory of a vehicle to protect the agency from claims of lost or stolen property. . . . [and], *pursuant to those procedures, agents began taking an inventory of Ochoa's car* shortly after the cell phone was seized.") (emphasis added); *United States v. Swan*, 259 F. App'x 656, 661 (5th Cir. 2007) (concluding that district court correctly determined that impoundment of the vehicle was mandatory and that discovery of the contraband was inevitable

because: "The arresting officer testified that police department policy required the impounded vehicle to be inventoried, and the appropriate forms completed, before the vehicle could be released to the towing company. Therefore, the vehicle would have been inventoried before leaving the scene. The officer further testified that he had the necessary forms in his vehicle and that it would have been permissible to allow Swan to remove personal items before impoundment, which would have necessitated a limited inspection for weapons. . . . *Moreover, there was no contrary evidence to suggest that the arresting officer did not follow appropriate procedures for impounding a vehicle*.") (emphasis added); *United States v. Doe*, 801 F. Supp. 1562, 1583 (E.D. Tex. 1992) (concluding that the government failed to prove that evidence would have been lawfully discovered because: "in the context of its inevitable discovery argument, the government is not arguing for the lawfulness of an inventory search that did occur, but, rather, postulating that a proper inventory search inevitably would have occurred. Necessarily, there must be additional proof to show [inevitability]. Thus, to satisfy the inevitable discovery doctrine, there must be evidence that the standardized inventory procedures were routinely followed by officers in the Rusk City Police Department, and by Officer Crow himself.").

Additionally, while Officers Sullivan and Paulos characterized the search as an "inventory search," neither testified that the search was conducted to protect the contents of the vehicle. Thus, although the impoundment of the vehicle was proper, the Government has not demonstrated that lawful discovery of the evidence seized was inevitable. Denial of the Motion to Suppress based on the inevitable discovery rule is, therefore, not appropriate.

### III. Motion to Sever Count Three (Doc. 52)

Defendant contends that Counts 1 and 3 of the Superseding Indictment are improperly joined because the counts charge him with being a felon-in-possession of a firearm on two different dates in two different places, and joinder of the counts is unfairly prejudicial. He, therefore, contends that Count 3 should be severed pursuant to Federal Rule of Criminal Procedure 8(a).

Rule 8(a) states that the indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged whether felonies or misdemeanors or both are of the same or similar character, or are based on the same act or transactions, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder." *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir.1995) (citing *United States v. Park*, 531 F.2d 754, 761 (5th Cir. 1976)). Additionally, Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Having determined that the Motion to Suppress evidence seized on June 26, 2015, which forms the basis for Counts 1 and 2, will be granted, Defendant's motion to sever Count 3 in light of Count 1 is moot and is, therefore, **denied as moot.**

### IV. Conclusion

For the reasons stated, the court **concludes** that impoundment of the vehicle driven by Defendant on June 26, 2015, was appropriate under DPD's Patrol and Vice Procedures for impounding vehicles and the community caretaking exception, but the Government has not met its burden of showing that the searches of the vehicle fall under the inventory exception to the Fourth

Amendment's prohibition against unreasonable warrantless searches and seizures; nor has it demonstrated that there was a reasonable probability that the evidence seized on this date would have been inevitably discovered by lawful means in the absence of police misconduct. Accordingly, the court **grants** Defendant's Motion to Suppress (Doc. 33), and all evidence seized on June 26, 2015, as a result of the searches of the Lincoln Town Car is **suppressed** and will not be admissible for any purpose in the trial of this case. Having determined that the Motion to Suppress evidence that forms the basis for Counts 1 and 2 should be granted, Defendant's Motion for Severance (Doc. 52) with respect to Count 3 is moot and is, therefore, **denied as moot.**

**It is so ordered** this 22nd day of August, 2017.

Sam A. Lindsay
United States District Judge